**Harold Arthur SMITH,**
**Plaintiff-Appellee,**

v.

**Nathan D. UPDEGRAFF, Kenneth L. Whitehead, Robert Terlouw, Louise G. Mc Klveen, Dick Lee Dunsbergen, Alan K. Wheeler, and Jasper County, Iowa, Defendants-Appellants.**

**Nos. 83–2236–SI, 83–2237–SI.**

United States Court of Appeals, Eighth Circuit.

Submitted April 10, 1984.

Decided Oct. 1, 1984.

Rehearing Denied Oct. 25, 1984.

Keith E. Uhl, Ann Fitzgibbons, Scalise, Scism, Sandre & Uhl, Des Moines, Iowa, for plaintiff-appellee.

Herbert S. Selby, Selby, Updegraff & Smith, Newton, Iowa, for defendant-appellant Updegraff.

Before BRIGHT and BOWMAN, Circuit Judges, and SWYGERT, Senior Circuit Judge.*

SWYGERT, Senior Circuit Judge.

Harold Smith brought this action under 42 U.S.C. §§ 1983, 1985, and 1986, alleging that Jasper County, Iowa, Sheriff Darrell Hurley, Deputy Sheriffs Alan Wheeler and Dick Dunsbergen, County Attorney Kenneth Whitehead, and Civil Service Commissioners Nathan Updegraff, Louise McKlveen, and Robert Terlouw conspired together and deprived him of his constitutional rights to freedom from coercion, due process of law, and equal protection. The suit arose from the plaintiff's discharge on February 6, 1976 from his position as deputy sheriff of Jasper County, as well as from actions allegedly taken by the defendants both before and after his discharge. The case proceeded to trial in federal court on June 7, 1982. At the close of the plaintiff's case, the district court dismissed the claims under 42 U.S.C. §§ 1985 and 1986. On the section 1983 claim, the jury re-

* The Honorable Luther M. Swygert, United States Senior Circuit Judge for the Seventh Circuit, sitting by designation.

turned a verdict against all the defendants except Jasper County,[1] assessing actual damages of $20,000 and punitive damages of $30,000 against defendant Updegraff, actual damages of $20,000 and punitive damages of $30,000 against defendant Whitehead, actual damages of $12,000 and punitive damages of $3,000 against defendant Dunsbergen, actual damages of $12,000 and punitive damages of $3,000 against defendant Wheeler, actual damages of $10,000 against defendant Terlouw, and actual damages of $10,000 against defendant McKlveen. The district court then directed a verdict for defendants Terlouw and McKlveen and entered a judgment for plaintiff Smith and against the remaining defendants for the damages assessed by the jury.

In their posttrial motions the defendants contended, among other things, that the jury verdict forms were improper because they gave the jury the opportunity to apportion actual damages when the applicable standards required joint and several liability. The district court concluded that the jury verdicts as to actual damages were improper and ordered a new trial on the issue of damages alone unless the plaintiff agreed to a remittitur. The remittitur assessed actual damages of $12,000 jointly and severally against defendants Updegraff, Whitehead, Dunsbergen, and Wheeler, and assessed punitive damages as determined by the jury. The court further ordered attorney fees of $18,774 be awarded to the plaintiff if he agreed to remittitur. The plaintiff subsequently accepted remittitur.

Defendants Updegraff, Whitehead, Dunsbergen, and Wheeler appeal the judgment against them on a number of grounds. They contend that (1) Smith's civil rights claim is barred because of prior state court proceedings, (2) the action is barred by the applicable statute of limitations, (3) defendant Whitehead is immune from a section 1983 suit for damages, (4) the district court erred in admitting hearsay evidence under Federal Rules of Evidence 801(d)(2)(E), (5) the evidence was insufficient to support the jury's verdict, (6) the defendants are entitled to a new trial because of the improper jury verdict forms, and (7) the plaintiff is not entitled to attorney fees because his application for fees was not timely filed and the award was not in the interest of justice. Before addressing each of these issues, we will first outline the testimony of the trial, stated in the light most favorable to the plaintiff, and describe the procedural background of this action.

I

A. *Evidence at Trial*

Harold Smith was hired as a Jasper County deputy sheriff on July 1, 1974. At that time Hurley was the sheriff and Wheeler was the first deputy sheriff. Later that year Dunsbergen was also hired as a deputy sheriff after taking a civil service examination and being certified as eligible by the Jasper County Civil Service Commission. Updegraff, McKlveen, and Terlouw were then members of the Commission, with Updegraff serving as chairman.

The conspiracy between the defendants was alleged to have begun in July 1974. Smith testified that on July 22, 1974, the night Dunsbergen took the civil service examination for prospective deputy sheriffs, he met Updegraff at the courthouse and informed him that Dunsbergen was not a high school graduate and therefore did not qualify for a deputy sheriff's position. Smith knew from a previous conversation with Hurley that Dunsbergen was to be the new deputy sheriff but was not a high school graduate. Hurley told Smith that he had discussed it with Updegraff and Updegraff was "going to take care of it." Because Smith did not want to be part of a "cover-up," he questioned Updegraff about Dunsbergen's eligibility. Updegraff became upset and told Smith that if Smith would take care of his job, he would take care of his. As soon as Smith arrived at work the next day, Hurley reprimanded

---

1. Sheriff Hurley died before the trial commenced and was dismissed from the suit.

him for his conversation with Updegraff. Several days later Smith talked to County Attorney Whitehead about Dunsbergen's ineligibility and Whitehead said he would take care of it. Dunsbergen was nevertheless hired as deputy sheriff. Smith apparently took no further action regarding the Dunsbergen hiring until October 1975.

In January 1975 Smith began an investigation of the Jasper County Home, an investigation previously initiated by Dean Danley. Danley had been recently fired from his position as a Jasper County deputy sheriff and was then Chief of Police of Colfax, Iowa. Over the course of several months, Smith interviewed twenty-five people and began preparing a case report on his investigation. In May 1975 his written report disappeared. Smith noticed as well that coffee had been spilled on other reports, and that his desk had been rifled. At the same time Hurley issued a new directive requiring deputies to report their position every hour on the hour. In the fall of 1975 Smith met with Whitehead and suggested that he had sufficient evidence of irregularities in the administration of the Home to warrant a full investigation. Whitehead became very irritated and told Smith that if he did not stop investigating the County he would suffer the consequences. Smith then discussed his investigation with the foreman of the Jasper County grand jury, Howard Alexander. Alexander and Smith together interviewed several people about problems at the Home. Alexander later met with Whitehead and discussed the investigation. When Whitehead failed to do anything, Smith and Alexander visited the Iowa Attorney General's office in September 1975 and turned over their information to state investigators. In early 1976 state officials revoked the Jasper County Home license.

In late August 1975 Robert Hurlbutt was hired by Jasper County, after being approached by Dunsbergen. He testified that he later had conversations about his duties with Hurley, and with Dunsbergen and Wheeler together at Dunsbergen's home. As a result of these conversations, he understood that he primarily was to investigate Smith rather than drug cases, which he allegedly had been hired to investigate. He further testified that Dunsbergen told him that they wanted to get Smith fired, and that if the job was accomplished they would need someone to fill the vacancy created. Wheeler and Hurley also indicated to Hurlbutt that they wanted to get Smith out of the department. Both Wheeler and Dunsbergen told Hurlbutt that Smith was corrupt and crooked and to do anything he could to get rid of him. Hurlbutt testified that he found nothing through his investigation to support this accusation. He further testified about conversations with Wheeler and Dunsbergen regarding the upcoming election for sheriff. Wheeler and Dunsbergen were both considering running for sheriff, and Hurlbutt had the impression that it was a team effort and they were concerned about running against Smith.

On October 7, 1975, Danley and Smith attended a Jasper County Civil Service Commission hearing. Danley told the Commission that he had an inquiry about the illegal hiring of unqualified deputy sheriffs. Smith also spoke on the subject. Danley questioned the Commission about its policy with regard to legal requirements. Updegraff avoided giving an answer concerning educational requirements and threatened to remove Danley from the meeting.

The next day Deputy Sheriff Lola Angel returned the lost Jasper County Home file to Smith. She testified that Hurley told her to keep it in her desk drawer, that she was not involved in the investigation, and that it was unusual to keep that file in her desk drawer. A few days later Smith had a conversation with Hurley regarding Smith's appearance at the Commission meeting as well as Smith's visit to the Attorney General's office in September. Hurley had been made aware of the Attorney General's investigation as a result of a telephone call from Whitehead. He was very angry that Smith attended the meeting, and was very upset about the investi-

gation, telling Smith that he was "the one who caused it."

During this time period, Smith believed he was being followed. He also testified that one night in November 1975, he noticed a vehicle being driven past his house several times. He went outside, hid behind some bushes, and heard two gun shots, which he was sure came from the vehicle. He got a fairly good look at the vehicle and believed that it was Hurley's private automobile. Danley testified that he was on patrol that night when Smith drove up, told him what had happened, and described the car. Danley testified that fifteen or twenty minutes earlier he had seen the car, that it looked like the sheriff's car, and that it appeared that the occupants were Whitehead and Wheeler.

Early in December Robert Hubbell met with Hurley. Hubbell was formerly employed by the Colfax Police Department and wanted to take the civil service examination. He testified that after conversing for a while, Hurley told him that he should follow up on certain things, and that he should talk to the County attorney. The sheriff walked with Hubbell to Whitehead's office. Hurley was present when Whitehead brought up Smith's name. Hubbell agreed "to work undercover to try and figure out what Smith and Danley were doing," with the understanding that he would not be paid, but would receive a letter of recommendation. Whitehead told Hubbell to "get something on Smith no matter what." Whitehead also promised Hubbell that if he ran into any problems, Whitehead would protect him and no charges would be filed against him. Hubbell told Whitehead that he would not do anything illegal. Whitehead then "seemed uptight" and again told Hubbell to get Smith anyway he could. Hubbell testified that he did not discover anything illegal or improper about Smith's activities.

Hubbell also testified that in his meeting with Hurley, Hurley talked with him about getting a gun permit and suggested that Hubbell state on his application that he "carried a lot of money." After he started

working for Whitehead and Hurley, he was riding with Dunsbergen in a patrol car. Dunsbergen told him that if they ran into Smith or Danley that Hubbell was to cover him, and if Smith did anything "funny or moved," Hubbell was to "blow him away." Hubbell later broke off his relationship with officials of Jasper County because he was afraid of what was going on, and communicated his fear to Whitehead.

Several other events occurred in December 1975. Smith testified that during December he heard radio transmissions between Wheeler and Dunsbergen concerning him. After he attempted to get tapes of the transmissions from the Sheriff's Office, Hurley put up a notice stating that no deputy could play back tapes without his prior approval. Gene Lund testified that in December he was called into the Sheriff's Office. Dunsbergen and Hurley wanted him to sign a statement that said Smith had been harassing him while he was in jail. Lund was about to serve another six-month sentence and was told that if he signed it he would be a "trusty," but if he did not things would go badly for him. Lund signed the statement and it was witnessed by Hurley and Dunsbergen. At trial Lund testified that in fact Dunsbergen, not Smith, had been harassing him and his wife.

Whitehead testified that during this period of time he was attempting to find a means to validate the Civil Service Commission's certification of Dunsbergen. He testified that at one time he spoke to Updegraff about the certification. Smith testified that in January 1976 he again met with Whitehead about the Dunsbergen hiring. Based on advice he had received from the Attorney General's Office, Smith had prepared a preliminary information against the Commission and presented it to Whitehead. Whitehead slammed the papers down and told Smith that he, the Commission, and the sheriff knew what Smith was trying to do and he was not going to get away with it. Whitehead then left his office. Smith followed him and overheard a conversation in the courthouse hallway be-

tween Whitehead and Updegraff, in which they were discussing Smith's attempt to file charges. When Updegraff saw Smith, he and Whitehead stepped into the auditor's office.

After this, Smith took a medical leave on the advice of his doctor. He returned to work on February 2. On February 4 he was notified that he had been demoted from second deputy to deputy. After receiving the notice, he wanted to talk to the sheriff and learned that he was at the courthouse, where a Civil Service Commission meeting was about to begin. When Smith arrived, Updegraff and Hurley were talking in the back of the meeting room; Smith and Hurley were the only members of the public in attendance at the meeting. The purpose of this particular meeting was to note that Dunsbergen had resigned and then to certify him as eligible, based upon a recently acquired GED certificate, for reappointment as a deputy sheriff. As the meeting was about to close, Smith spoke up and said he had come to talk to the sheriff but also wanted to talk to Updegraff about his demotion. Updegraff told him it was a proper demotion. Smith testified that the sheriff then got up and confronted him, saying that Smith was creating problems. Hurley also told Smith that he would fire him, and Smith replied that he could not stop Hurley from firing him but that this was the kind of thing that Hurley had been sued over before. Updegraff testified that Hurley told him right after that meeting that he was going to fire Smith.

Hurley fired Smith two days later, and Whitehead drafted the notice of removal. Smith contested his termination and was granted a hearing before the Civil Service Commission. After the termination and before the hearing, Whitehead met with Hurley on several occasions. On at least one occasion, Whitehead also visited Updegraff's office to talk about the Smith matter. Smith also had a conversation with Whitehead before the hearing. Smith testified that Whitehead told him that if he tried to attack the Sheriff's department at the hearing, Updegraff would hold him in contempt and Whitehead would prosecute

him. Hurlbutt also testified about a meeting he had with Hurley and Whitehead on the day of the hearing. Hurley and Whitehead wanted to know if he could come up with anything that could be used against Smith. They both told Hurlbutt that if he were called as a witness, he was to testify that he had been hired to investigate drugs, not Smith. Hurlbutt was not called as a witness. The hearing was held on three evenings, with Updegraff presiding and Whitehead representing the Sheriff's Office. The Commission upheld the termination.

Several months after the dismissal, Ebin Van Dusseldorp, Jr., a friend of Hurley's, had a conversation with Hurley about Smith's termination. Hurley told Van Dusseldorp that he had had some false information before he made the dismissal and would like to talk about it at sometime, but he never did. In October 1976 Melvin Mullenaux, then Mayor of Colfax, set up a meeting with Danley, Smith and Hurley, at Hurley's request. Mullenaux testified that at the meeting, Hurley told Smith that he had been wrong in dismissing him and had listened to lies from Whitehead, Wheeler, and Dunsbergen. During the fall of 1980 Danley had another conversation with Hurley about Smith's termination. Danley asked Hurley why he had fired Smith on such minor charges. Hurley replied that he had gone to see Updegraff and had been told that charges would have to be filed before Updegraff could remove Smith. Danley also asked Hurley how he had been able to hire Dunsbergen. Hurley said that he had talked to Updegraff and that he and Updegraff had made a "deal" in which Updegraff would arrange Dunsbergen's qualifications because he knew Dunsbergen was a friend of one of the supervisors on the county board.

### B. *Procedural Background*

Following the Jasper County Civil Service Commission's decision upholding his dismissal, Smith appealed to the Jasper County Iowa District Court pursuant to the provisions of section 341A.12 of the 1975

Code of Iowa.[2] The Commission's decision was challenged on four grounds: (1) the Commission's findings were not supported by substantial evidence; (2) the Commission applied erroneous legal standards; (3) the Commission's order, findings, and conclusions of law were arbitrary, capricious, an abuse of discretion and in violation of due process of law; and (4) the Commission's order, findings, and conclusions of law were not made in good faith nor for cause. The appeal was heard without additional evidence. Smith attached several exhibits to his brief to the court, but the court refused to consider these exhibits because they had not been offered as evidence at the hearing before the Commission. Based on the record developed before the Commission, the district court determined that there had been sufficient evidence to support the Commission's decision, and further concluded that nothing in the record indicated that the Commission had acted in bad faith, abused its discretion, or acted arbitrarily or capriciously, or in violation of due process of law.[3] Smith then filed a notice of appeal to the Iowa Supreme Court. Because the notice of appeal was not timely filed, the Iowa Supreme Court dismissed the appeal.

On February 6, 1978 Smith filed a lawsuit in Jasper County District Court. The petition alleged conspiracy resulting in wrongful discharge and raised additional contract, tort, and state statutory claims against the named defendants, Nathan Updegraff, Kenneth Whitehead, Darrell Hurley, Robert Terlouw, and Louise McKlveen. The district court granted the defendants' motions for summary judgment on the ground that Smith's action was barred by the prior Civil Service Commission's decision and the subsequent appeals. Smith then appealed the summary judgment order. On August 20, 1980 the Court of Appeals of Iowa reversed the district court's order and remanded the case for trial on the merits. The court held that the doctrine of issue preclusion did not bar Smith's action. Noting the limited review of the Commission's decision, the court determined that the broader allegations of conspiracy and wrongful conduct raised in the lawsuit had been neither placed in issue nor determined during the prior action.

When the Court of Appeals of Iowa issued its decision, Smith had already filed this action in federal court. Smith elected to pursue his federal suit, and did not proceed with a state trial. This appeal follows from the judgment entered against the defendants as a result of the federal trial.

## II

### A. *Res Judicata/Collateral Estoppel*

Appellants first argue that Smith's suit is barred by the doctrines of res judicata

---

**2.** Section 341A.12 provides in part:
Discipline—hearing.
No person in the classified civil service who has been permanently appointed or inducted into civil service under provisions of this chapter shall be removed, suspended, or demoted except for cause, and only upon written accusation of the county sheriff, which shall be served upon the accused, and a duplicate filed with the commission. Any person so removed, suspended, or reduced in rank or grade may, within ten days after presentation to him of the order of removal, suspension or reduction, appeal to the commission from such order. The commission shall, within two weeks from the filing of such appeal, hold a hearing thereon, and fully hear and determine the matter, and either affirm, modify, or revoke such order. The appellant shall be entitled to appeal personally, produce evidence, and to have counsel.... If the order of removal, suspension, or demotion is con-

curred in by a majority of the commission, the accused may appeal therefrom to the district court of the county where he resides.... The court shall proceed to hear and determine the appeal in a summary manner. Such hearing shall be confined to the determination of whether the order of removal, suspension, or demotion made by the commission was made in good faith and for cause, and no appeal shall be taken except upon such grounds. The decision of the district court may be appealed to the supreme court.

**3.** In its March 10, 1977 order, the district court stated that "only the evidence offered in support of the alleged grounds for removal are [sic] being considered except such evidence that might have been brought out in cross-examination that would tend to affect the credibility of the testimony of Sheriff Hurley or his witnesses."

and collateral estoppel because both the Civil Service Commission and the Jasper County District Court upheld Smith's discharge based on the grounds stated in the discharge notice. We have little difficulty rejecting appellants' argument.

The doctrines of res judicata and collateral estoppel serve to protect the finality of judgments. The doctrines are borne of the recognition that "endless litigation leads to chaos; that certainty in legal relations must be maintained; and that after a party has had his day in court, justice, expediency and preservation of the public tranquillity requires that the matter be at an end." *Schroeder v. 171.74 Acres of Land*, 318 F.2d 311, 314 (8th Cir.1968). Necessarily, federal courts must give a state court judgment the same preclusive effect that would be given that judgment under the law of the state where the judgment was rendered. *Migra v. Warren City School District Board of Education*, —— U.S. ——, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). Accordingly, we must apply Iowa law to determine whether Smith's section 1983 claim is barred by the prior state decisions.

Under Iowa law res judicata, or claim preclusion, bars relitigation of the same claim between parties or their privies where a final judgment has been rendered upon the merits by a court of competent jurisdiction. *See National Farmers Union Property & Casualty Co. v. Nelson*, 260 Iowa 163, 147 N.W.2d 839 (1967). However, the party sought to be precluded by the earlier litigation must have had a "full legal opportunity for an investigation and determination of the matter." *Third Missionary Baptist Church of Davenport v. Garrett*, 158 N.W.2d 771, 774–75 (Iowa 1968); *McCullough v. Connelly*, 137 Iowa 682, 114 N.W. 301, 302 (1907).

Applying the Iowa rule to the instant facts we conclude that appellants' res judicata argument must fail. First, the doctrine only applies to suits between the same parties or their privies. None of the appellants was named a party or in privity with any party to the discharge review proceedings. Consequently, an essential element of the res judicata doctrine is not present here. Second, Smith did not have a "full legal opportunity for an investigation and determination of" the matters he raises before this court. *Garrett, supra*, 158 N.W.2d at 775. The Jasper County Court's review of the Commission hearing was made pursuant to Iowa Code § 341A.12 which provides:

> The court shall proceed to hear and determine the appeal in a summary manner. Such hearing shall be confined to the determination of whether the order of removal, suspension or demotion made by the commission was made in good faith and for cause, and no appeal shall be taken except upon such grounds.

Under Iowa law, therefore, the Jasper County District Court's summary review could not determine the broader section 1983 claim at issue here. In fact, the court stated that its review was limited to the evidence before the Commission and expressly refused to consider additional affidavits submitted by Smith. Because Iowa law precluded Smith from presenting his section 1983 claim to the Jasper County Court, res judicata does not now bar the claim.

Similarly, we must reject appellants' collateral estoppel argument. Under Iowa law collateral estoppel, or issue preclusion, applies only where four requirements are met: (1) the issue concluded must be identical, (2) the issue must have been raised and litigated in the prior action, (3) the issue must have been material and relevant to the disposition of the prior action, and (4) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment. *Mauer v. Rohde*, 257 N.W.2d 489, 497 (Iowa 1977).

Applying these principles, we find that appellants' collateral estoppel argument is fatally flawed. The doctrine requires that the issue alleged to be precluded be identical to the one raised and litigat-

ed in the prior action. Here Smith did not discover evidence of the conspiracy until after the Iowa Supreme Court had denied his appeal of the Civil Service Commission decision. No constitutional issues were raised or actually litigated before the Commission or the Jasper County District Court. Moreover, as we stated earlier, because the Jasper County Court's review was limited by Iowa Code § 341A.12, it could not consider the issues of conspiracy and deprivation of constitutional rights; the review was limited to evidence before the Commission offered in support of Smith's discharge. It is therefore our opinion that the four requirements for collateral estoppel have not been fulfilled.

### B. *Statute of Limitations*

■ Appellants also contend that Smith's claim is time barred. The district court found that Smith's claim accrued on March 18, 1976 or approximately three and one-half years before Smith filed his complaint on October 2, 1979. Because this claim was brought under 42 U.S.C. § 1983 which does not provide a specific limitations period, its timeliness must be determined by applying the most analogous limitations provision of the relevant state law. *Clark v. Mann*, 562 F.2d 1104, 1111 (8th Cir.1977). The district court determined that the most analogous provision of Iowa law is Iowa Code § 641.1(4) (1979) which has a five-year limitations period. Accordingly, the district court ruled that Smith's complaint was timely filed and denied appellants' motion for summary judgment. We find no error.

■ Two Iowa statutes have been persuasively argued before this court as applicable to section 1983 actions. They are

Iowa Code §§ 614.1(2) and 614.1(4).[4] When the district court ruled that the five-year statute applied to Smith's claim the law in this circuit was not clear. Indeed, various panels of this court had taken inconsistent approaches in applying Iowa statutes of limitations to section 1983 actions. *E.g., compare Glasscoe v. Howell*, 431 F.2d 863 (8th Cir.1970) (rejecting a tort analogy and concluding section 614.1(4), the five-year statute, applied), *with Savage v. United States*, 450 F.2d 449 (8th Cir.1971), *cert. denied*, 405 U.S. 1043, 92 S.Ct. 1327, 31 L.Ed.2d 585 (1972) (accepting tort analogy and concluding that section 614.1(2), the two-year statute, applied). After the district court's ruling, however, this court held that the proper period of limitations for section 1983 actions in Iowa is the five-year period prescribed by Iowa Code § 614.1(4), which governs actions not specifically covered by other statutes of limitations. *Garmon v. Foust*, 668 F.2d 400 (8th Cir.) (en banc), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982).

In *Garmon* a student sued three Des Moines police officers under section 1983, alleging that as a result of an illegal search and seizure, he suffered severe emotional distress, damage to his reputation, and impaired earning capacity. The officers sought summary judgment, arguing that Iowa's two-year statute of limitations for actions founded on injuries to person or reputation, barred the student's claim. Reasoning that his claim could not be narrowly characterized as merely an action for injuries to his person or reputation, this court concluded that Iowa Code § 614.1(2), "unduly cramps the significance of section 1983 as a broad remedy" for the depriva-

---

4. Iowa Code § 614.1 provides in pertinent part:
 Actions may be brought within the times herein limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially declared:
 2. Injuries to person or reputation—relative rights—statute penalty. Those founded on injuries to the person or reputation, including injuries to relative rights, whether based on contract or tort, or for a statute penalty, within two years.

4. Unwritten contracts—injuries to property—fraud—other actions. Those founded on unwritten contracts, those brought for injuries to property, or for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery, and all other actions not otherwise provided for in this respect, within five years.

tion of federal constitutional rights. *Id.* at 406. *Garmon* is dispositive here, and for the reasons set forth in the *Garmon* opinion, we affirm the district court's order.

## C. *Prosecutorial Immunity*

■ Appellant Whitehead urges reversal of the district court's order denying his motion for summary judgment. He contends that he has absolute immunity from liability under 42 U.S.C. § 1983 because he was acting as the duly-elected Jasper County Attorney at all times material to the case at bar. We conclude that Whitehead is not immune from the charges here, arising from conduct clearly beyond the scope of his authority and wholly unrelated to his role as an advocate.

In support of his position, Whitehead cites *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). In *Imbler* the Supreme Court held that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Id.* at 431, 96 S.Ct. at 995. The Court, however, left open the question whether a prosecutor's immunity extends to actions in which the prosecutor acts as an investigator or administrator rather than an advocate. *Id.* at 430–31, 96 S.Ct. at 994–95. The rule in this circuit is clear, "[p]rosecutors enjoy immunity from section 1983 actions 'so long as the actions complained of appear to be within the scope of prosecutorial duties.'" *Price v. Moody*, 677 F.2d 676, 677 (8th Cir.1982) (per curiam) quoting *Keating v. Martin*, 638 F.2d 1121, 1122 (8th Cir.1980) (per curiam).

In *Price* a prisoner filed a pro se complaint against a prosecutor under 42 U.S.C. § 1983. In his complaint the prisoner alleged that the prosecutor, while acting under color of state law, had deprived him of certain federal constitutional rights by ordering his confinement under barbaric con-

ditions. The district court granted the prosecutor's motion to dismiss, ruling that even if the prisoner's allegations were true the prosecutor enjoyed absolute immunity. This court reversed, holding that the prosecutor would be liable under section 1983 because the prosecutor's actions clearly were not within the scope of his prosecutorial duties.

The question we must answer then is whether Whitehead's conduct was within the scope of his prosecutorial duties. Our review of Smith's complaint and the evidence adduced at trial satisfies us that Whitehead's conduct was outside the scope of his office. First, Robert Hubbell testified that Whitehead "hired" him to work undercover to "get Smith no matter what," even if it meant framing Smith. When Hubbell objected, saying he would not do anything illegal, Whitehead reiterated that Hubbell was to get Smith any way he could and that no charges would ever be filed against him by the Jasper County Attorney's Office. Second, Whitehead threatened to prosecute Smith if he attacked the Sheriff's Office during his discharge hearing before the Civil Service Commission. We find these examples of Whitehead's conduct more than sufficient to conclude that Whitehead was acting outside the scope of his prosecutorial duties.

## D. *Admission of Evidence*

The appellants contend that the district court erroneously admitted hearsay evidence as to the conspiracy under Federal Rule of Evidence 801(d)(2)(E). They have not specified what testimony, in particular, they believe was inadmissible other than to state that the largest category of hearsay evidence was testimony as to statements made by Sheriff Hurley.[5] Following the procedures of *United States v. Bell*, 573 F.2d 1040 (8th Cir.1978), the district court

---

**5.** To the extent that the appellants object to the admission of their own out-of-court statements, we note that they were independently admissible under Federal Rule of Evidence 801(d)(2)(A). *See, e.g., United States v. Hewitt*, 663 F.2d 1381, 1388 (5th Cir.1981). In addition,

the Confrontation Clause was not implicated since by its terms it applies only to criminal prosecutions. Here the defendants were free to call their alleged co-conspirators as witnesses and indeed all of the appellants testified at trial.

admitted hearsay evidence when offered, contingent upon subsequent proof by a preponderance of the independent evidence that the statements were made by a co-conspirator during the course and in furtherance of the conspiracy. Before the case was submitted to the jury, the court then ruled that the statements were admissible based on findings that a conspiracy between the declarant and the defendants had been shown by a preponderance of the independent evidence and the declarant's statement was in furtherance of the conspiracy.[6] In its post-trial order, the court again rejected the defendants' argument that the contested statements were inadmissible under Rule 801(d)(2)(E) and also held that even if certain statements were not in furtherance of the conspiracy, they were independently admissible as admissions under Rule 801(d)(2)(A) and as statements against pecuniary interest under Rule 804(b)(3). We find no error.

 The out-of-court statements of a co-conspirator can be admitted into evidence against a party under Rule 801(d)(2)(E) if the statement was made during the course of and in furtherance of a conspiracy. Such statements can be admitted contingent upon proof by a preponderance of the evidence independent of the co-conspirator's declaration that a conspiracy existed between the declarant and the defendants. *United States v. Smith,* 596 F.2d 319, 321–22 (8th Cir.1979); *Bell, supra,* 573 F.2d at 1044. When conditionally admitted, the court must determine the admissibility of the statement at the conclusion of the evidence. *Bell, supra,* 573 F.2d at 1044. Here the court correctly determined that there was sufficient evidence of a conspiracy between Hurley and the defendants to permit admission of Hurley's statements made during the course and in furtherance of the conspiracy.

The evidence of the defendants' conduct established their association for unlawful purposes. Updegraff became upset when Smith first questioned him in July 1974 about Dunsbergen's ineligibility for a deputy sheriff position. Hurley reprimanded Smith the next day for confronting Updegraff and subsequently became angry with Smith about his investigation of the County Home and his appearance before the Civil Service Commission regarding the Dunsbergen hiring. Whitehead was furious when Smith presented the information against the Civil Service Commission to him and immediately thereafter met Updegraff in the courthouse hallway.

As a result of conversations with Wheeler, Dunsbergen, and Hurley, Robert Hurlbutt investigated Smith's activities. Robert Hubbell also investigated Smith's activities following conversations with Whitehead and Hurley. Smith's reports on the County Home disappeared and his desk was rifled. He noticed on several occasions that he was being followed. Shots were fired at his home from a car Smith identified as belonging to Hurley; Danley saw the same car that night and identified Whitehead and Wheeler as its occupants. Gene Lund was called into the Sheriff's Office and signed a statement witnessed by Hurley and Dunsbergen that accused Smith of harassing Lund and his wife when, in fact, Dunsbergen had been harassing them. Whitehead called Updegraff about Dunsbergen's eligibility, and also met with him regarding Smith's hearing before the Commission. Finally, Updegraff admitted at trial that he knew Smith would be discharged before Hurley actual-

---

**6.** Because the district court stated on the record that "there has been sufficient independent evidence to show that there is a possibility of conspiracy," the appellants also argue that the court made no finding that a conspiracy had been proved by a fair preponderance of the independent evidence. Although this quote is not precisely in line with *Bell,* we have no doubt that the court, in fact, applied the preponderance of the evidence standard. Subsequent to the statement on which the appellants rely, the district court explicitly found, for purposes of Rule 801(d)(2)(E), that "a conspiracy existed" and that the declarations in questions had been made pursuant to the conspiracy. In ruling on the defendants' post-trial motions, the court again stated that it had found "that the allegations of conspiracy were supported by a preponderance of the evidence."

ly fired him, and ultimately wrote the findings upholding Hurley's action.

Each defendant's out-of-court statements, admissible against him under Rule 801(d)(2)(A), were further independent evidence of participation in a conspiracy. *See United States v. Smith*, 600 F.2d 149, 152 (8th Cir.1979); *United States v. Friedman*, 593 F.2d 109, 116 (9th Cir.1979); *United States v. Moore*, 571 F.2d 76, 90 n. 12 (2d Cir.1978); *United States v. Scholle*, 553 F.2d 1109, 1117–18 (8th Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977). Wheeler and Dunsbergen told Hurlbutt that they wanted to get Smith fired. After Hurley brought Hubbell to Whitehead's office, Whitehead told Hubbell to get Smith "no matter what" and that no charges would be filed against him. Hubbell later was told by Dunsbergen "to blow Smith away if necessary." After Smith presented the information to Whitehead, Whitehead told him he would suffer the consequences of his actions. Whitehead later told Smith that he would prosecute him for contempt if he attempted to attack the Sheriff's Office at his Commission hearing. This independent evidence of an illegal association between Hurley and the defendants was adequate to permit the admission into evidence of Hurley's statements made during the course of the conspiracy.

■ We agree with the defendants' next contention that Hurley's statements to Mullenaux, Dusseldorp, and Danley after Smith's discharge and the Commission hearing were not in furtherance of the conspiracy. However, the district court held that these statements were admissible on other grounds. We find no error in this determination; nor do defendants appear to challenge the ruling.[7]

### E. *Sufficiency of the Evidence*

■ In their posttrial motions, the appellants sought judgment notwithstanding the verdict on the ground that the evidence did not support the jury verdict against them. The standard for ruling on such motions was set forth in *Hanson v. Ford Motor Company*, 278 F.2d 586 (8th Cir. 1960):

> [I]n passing upon the motion for judgment, the trial court and this court are (1) to consider the evidence in the light most favorable to the plaintiffs as the parties prevailing with the jury; (2) to assume that all conflicts in the evidence were resolved by the jury in favor of the plaintiffs; (3) to assume as proved all facts which plaintiffs' evidence tends to prove; (4) to give the plaintiffs the benefit of all favorable inferences which may reasonably be drawn from the facts proved; and (5) to deny the motion if, reviewing the evidence in this light, reasonable men could differ as to the conclusions to be drawn from it.

*Id.* at 596. Moreover, "[c]ircumstantial as well as direct evidence ... is relevant to a determination of sufficiency" of the evidence in supporting the jury verdict, and the verdict may be overturned " 'only where the evidence points *all one way* and is susceptible of *no* reasonable inferences sustaining the position of the nonmoving party.' " *Zoll v. Eastern Allamakee Community School District*, 588 F.2d 246, 250 (8th Cir.1978) quoting *Giordano v. Lee*, 434 F.2d 1227, 1231 (8th Cir.1970) (emphasis in original).

Applying this standard to the facts of this case, we find no basis for overturning the jury's verdict against the appellants. The evidence presented at trial, recounted in the first section of this opinion, was more than adequate to support the jury's conclusion that the appellants acted in concert and deprived Smith of his constitutional rights.

### F. *Jury Verdict Forms*

Although appellants failed to make an objection at trial, they contend on appeal

---

7. In these statements made after the discharge, Hurley either explicitly or implicitly acknowledged a concert of action with the defendants or admitted that he was wrong to fire Smith. Given that Hurley was subject to a civil suit for his actions, and indeed made some statements after this action alleging conspiracy was actually filed, we believe the statements were admissible under Rule 804(b)(3) as statements against interest when made.

that the district court erred in denying their motion for mistrial and renewed motion for a new trial because, as Smith concedes, the jury verdict forms were improper and caused the jury to attempt to apportion actual damages when the law requires joint and several liability.

Initially, we conclude that this matter is governed by Fed.R.Civ.P. 51. We believe Rule 51 was intended to encompass jury verdict forms and find no compelling reason to decide otherwise. Under Rule 51, "[N]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

Appellants failed to make an objection to the verdict forms either at the time of trial, after the jury retired or within the time frame for filing a motion for new trial.[8] Ordinarily Rule 51 would bar any appeal. However, where a plain or fundamental error seriously affects the fairness, integrity, or public reputation of the judicial proceedings, appellate review is not precluded by the party's failure to object. *Lange v. Schultz*, 627 F.2d 122 (8th Cir.1980). We hold that the error in the jury verdict forms is the kind of plain or fundamental error that permits appellate review.

As set forth earlier, the jury returned the following verdicts against the appellants:

> $20,000 actual damages and $30,000 punitive damages against Nathan Updegraff,
>
> $20,000 actual damages and $30,000 punitive damages against Kenneth Whitehead,
>
> $12,000 actual damages and $3,000 punitive damages against Dick Dunsbergen, and
>
> $12,000 actual damages and $3,000 punitive damages against Alan Wheeler.

After a hearing concerning the improper verdict forms, the district court denied appellants' motions for mistrial but vacated the judgment and ordered a new trial solely on the issue of damages unless Smith agreed to a remittitur in the amount of $78,000 allocated as follows:

> $12,000 actual damages jointly and severally against Nathan Updegraff, Kenneth Whitehead, Dick Dunsbergen, and Alan Wheeler,
>
> $30,000 punitive damages against Nathan Updegraff,
>
> $30,000 punitive damages against Kenneth Whitehead,
>
> $3,000 punitive damages against Dick Dunsbergen, and
>
> $3,000 punitive damages against Alan Wheeler.

The district court left the jury's award of punitive damages undisturbed because the court had submitted the issue of punitive damages separately and the jury had been properly instructed that it could award punitive damages against any or all of the appellants. Smith agreed to the remittitur and this appeal followed.

Obviously, the remittitur was an attempt by the district court to align the jury's award of actual damages with the rule that co-conspirators are jointly and severally liable for all damages resulting from the conspiracy. *See Shoemaker v. Jackson*, 128 Iowa 488, 492, 104 N.W. 503, 504 (1905). The substance of the appellants' argument to this court is that a remittitur was an inappropriate "cure" under the circumstances. We disagree.

The district court correctly instructed the jury on the extent of the plaintiff's entitlement to compensatory damages if the defendants were found liable. The appellants' only source of complaint is that the jury was required to enter the amount of actual damages Smith suffered as a result of the conspiracy on seven separate verdict forms, one for each defendant. Apparently, instead of repetitiously entering the

---

8. The judgment below was entered on June 18, 1982. Appellants filed their motions for new trial on June 23 and 24, 1982, but did not file their motions concerning the verdict forms until March 3, 1983.

same amount on seven different forms the jury concluded that the purpose of entering the amount of actual damages seven times was to apportion the damages among the conspirators. Arguably, therefore, the total of the separate verdicts is the amount of actual damages that the jury found Smith had suffered. Although this argument is persuasive, it ultimately amounts to mere speculation as to what the jury intended and this court cannot replace the jury's judgment with its own. *See Milanovich v. United States*, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961). We, however, find no speculation was involved in the remittitur in the instant case.

As the district court stated, the jury clearly found each appellant individually responsible for at least $12,000 in actual damages.[9] Because no speculation is necessary to then hold the appellants jointly responsible for $12,000, that amount should be jointly and severally satisfied. Appellants have no legitimate complaint of prejudice from the remittitur and we conclude that it was a proper remedy to apply in this case.

### G. *Attorney Fees*

█ Appellants' final contention is that the district court erred in awarding attorney fees to Smith because Smith had filed his application after the date required by Local Rule 2.9. Local Rule 2.9 states that "[a]ll post-judgment motions for awards of attorney fees shall be filed within twenty (20) days of the entry of a judgment, except if a statute provides for a longer period of time."

In awarding attorney fees to Smith the district court cited Local Rule 1.2 which provides that "any of the rules shall be subject to such modification by the presiding judge as may be necessary in the interests of justice." Presiding Judge Donald O'Brien held that attorney fees were appropriate in this case, and at the hearing on the issue stated several reasons for his conclusions. Nothing more is required.

---

**9.** The district court noted that Smith's proof regarding actual damages for expenditures and

### III

In conclusion, we find all the appellants' arguments raised in this appeal to be without merit. For the reasons stated, we affirm the judgment against all appellants.

loss of wages alone amounted to between $15,000 and $20,000.