**STEPHENS, INC., Appellee/Cross–Appellant,**

v.

**GELDERMANN, INC., Appellant/Cross–Appellee.**

Nos. 91–2204, 91–2232.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 8, 1992.

Decided April 24, 1992.

Otis Henry Story, III, Little Rock, Ark., argued (Lawrence J. Brady, on brief), for appellant/cross-appellee.

Jerry C. Jones, Little Rock, Ark., argued (Kenneth R. Shemin and Amy L. Stewart, on brief), for appellee/cross-appellant.

Before BEAM, Circuit Judge, BRIGHT, Senior Circuit Judge, and VAN SICKLE,* Senior District Judge.

BEAM, Circuit Judge.

Stephens, Inc., an Arkansas corporation, brought an action in federal district court against Geldermann, Inc., a Chicago based commodity futures merchant, for losses allegedly sustained through a house account Stephens maintained at Geldermann. Stephens raised a variety of claims based on state and federal law, seeking punitive as well as compensatory damages. The district court, through summary judgment or directed verdict, dismissed several of these claims, including one based on the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968. Ste-

---

* The HONORABLE BRUCE M. VAN SICKLE, Senior United States District Judge for the District of North Dakota, sitting by designation.

phens' claims alleging violations of the Commodity Exchange Act, fraud, conspiracy to defraud, and breach of contract went to a jury, which returned a verdict in favor of Stephens for $1,381,000 in compensatory damages and $1,000,000 in punitive damages. Although the jury did not specify the basis of Geldermann's liability, the verdict form required that punitive damages be premised on a finding of either fraud or conspiracy. After trial, Geldermann requested, and received, a $600,000 set-off against the verdict for funds which Stephens had voluntarily ceded to another party involved in the litigation. Geldermann appeals claiming that (1) the district court improperly admitted prejudicial hearsay; (2) Stephens failed to prove proximate cause for certain damages and, regardless, such damages were speculative; and (3) the district court erred in permitting the jury to consider punitive damages and in failing to adequately review the award. Stephens cross-appeals, arguing that the district court erred (1) in dismissing its RICO claim and (2) in granting Geldermann's motion for a set-off. We affirm on all issues.

## I. BACKGROUND

In May 1982, Stephens opened a commodity trading account at Geldermann, number 15233, in order to trade with Stephens' own funds (Stephens Account). A senior officer of Stephens, John Markle, had discretion and control over the account. About the same time, unbeknownst to Stephens, Markle opened another account at Geldermann, number 15245, in the name of his mother, Mercedes McCambridge (McCambridge Account). McCambridge alleged that she gave Markle approximately $1,000,000 to $1,100,000 to invest in certificates of deposit and other conservative investments. According to McCambridge, Markle assured her that he was following her investment directions.

Markle traded both accounts through Geldermann. A dedicated phone line ran from Markle's office at Stephens in Little Rock, Arkansas, to Geldermann's desk at the Chicago Board of Trade. Markle simply would pick up the phone in his office and direct a Geldermann employee in Chicago to buy or sell specific commodity futures. When Markle placed his orders, he never told the Geldermann employee the number of the account being traded. Under Commodity Futures Trading Commission (CFTC) regulations, however, a broker must ask a trader for the number of the account traded and write that number on the order ticket. 17 C.F.R. § 1.35(a–1)(1). In direct violation of the CFTC regulations, Geldermann employees permitted Markle to assign his trades to either the Stephens or the McCambridge Account at the end of the day, after he knew which trades had been profitable. Internal Geldermann memoranda dated from May to July 1984, supported an inference that Geldermann suspected trading improprieties involving the McCambridge Account, but actively concealed the Account's existence from Stephens to avoid losing Markle's business.

Between 1982 and 1987, the Stephens Account suffered trading losses of $5,267,-638.74 and Stephens paid Geldermann commissions and fees of $959,597.53 for a total loss of $6,227,236.27. The McCambridge Account, however, performed unusually well (92% of the account's trades were profitable) and realized a total profit of $854,444.58 with commissions and fees of $167,608.92. On October 6, 1987, Geldermann finally informed Stephens about the McCambridge Account and its unusual pattern of profitability. According to Stephens, Geldermann did so only because Stephens had learned a day earlier that Markle had been operating another account in Mercedes McCambridge's name at the Elders Commodity Firm in Chicago.

Stephens began to investigate Markle's trading activities and confronted him on October 7, 1987. According to the testimony of two Stephens officers, Markle initially denied any wrongdoing, but, at several later meetings, admitted to defrauding Stephens. Markle also indicated that he had received help and, on at least one occasion, specifically stated that "Geldermann" had helped him. During the later meetings, Markle also attempted to negotiate a settlement with Stephens. Near the end of the discussions, for example, Markle offered

Stephens $600,000 to be paid after Mercedes McCambridge's death. Stephens rejected the offer on November 13, 1987, demanding at least $1,000,000 within the next few weeks. Markle responded that he would need a month to work something out. At the same meeting, Warren Stephens, the president and chief executive officer of Stephens, promised Markle that Stephens would not sue him, but instead planned to sue Geldermann. Markle appeared relieved and again stated that he had been given help with his scheme. This meeting proved to be the last one between Markle and Stephens because shortly thereafter, Markle killed himself.

At the time Markle's scheme was uncovered, the McCambridge Account contained approximately $1,200,000. Geldermann transferred the funds to an account at Stephens in McCambridge's name. When McCambridge declared an intention to withdraw the funds, Stephens brought an action in state court to recover them as the proceeds of Markle's scheme to defraud Stephens. Stephens and McCambridge eventually reached a settlement whereby each received $600,000 from the McCambridge Account. Stephens further agreed to indemnify McCambridge for any liability to Geldermann and, in return, McCambridge assigned any claim she had against Geldermann to Stephens.

At the end of the trial, the jury was asked to determine whether Geldermann was liable to either Stephens or McCambridge for the losses they each alleged to have suffered. The jury had previously learned that both Stephens and McCambridge had received $600,000 from the McCambridge Account and the court instructed the jury in separate instructions to offset any damages awarded to either Stephens or McCambridge by any monies either had already received.[1] The jury re-turned a verdict in favor of Stephens against Geldermann and awarded Stephens $1,381,000 in compensatory damages and $1,000,000 in punitive damages. As to McCambridge's claims, however, the jury found in favor of Geldermann.

After trial, Geldermann requested the district court to offset the verdict in Stephens' favor by the $600,000 that McCambridge had received in the settlement. Geldermann argued that the jury's verdict against McCambridge demonstrated that Stephens' claim to the funds in the McCambridge Account as proceeds of Markle's fraud was superior to McCambridge's claim. The funds, therefore, always belonged to Stephens and the $600,000 McCambridge received was a voluntary transfer from Stephens. Geldermann thus asserted that a set-off was necessary to prevent double recovery by Stephens. The district court agreed, and granted Geldermann's motion.[2]

## II. DISCUSSION

### A. Hearsay

Geldermann contends that the district court improperly admitted prejudicial hearsay statements. The court permitted the two Stephens officers who had confronted Markle, Phillip Shellabarger and Warren Stephens, to testify about the statements Markle had made to them during their various conversations with him. Although Geldermann conceded that Markle's confession to defrauding Stephens was admissible, it objected to the portions of Markle's statements indicating that he had help. Relying on our decision in *Smith v. Updegraff*, 744 F.2d 1354, 1366 n. 7 (8th Cir.1984), the district court admitted the disputed hearsay as statements against interest made by an unavailable declarant, *see* Fed.R.Evid. 804(b)(3). Although we agree with Gelder-

---

1. In a post-trial order, the district court appears to imply that the jury did not know McCambridge had received $600,000 from the McCambridge Account. *See Stephens, Inc. v. Geldermann, Inc.,* No. LR–C–88–184, Order at 2 (E.D.Ark. Mar. 8, 1991). A stipulation read to the jury, however, stated that "Stephens and McCambridge each obtained the sum of $600,000." *See* Transcript at 1206.

2. The court also granted another set-off in the amount of $330,871.48, representing funds Stephens had received from Markle's estate. Stephens only challenges the $600,000 set-off on appeal.

mann that the district court erred in admitting the disputed portions of Markle's statements, we believe that this error was harmless.

■ Stephens urges us to follow *Smith*, but our opinion in that case provides little guidance here. In *Smith*, we commented in a footnote that certain statements made by a deceased declarant to the effect that he had acted in concert with others to wrongfully discharge an employee were admissible under Rule 804(b)(3) as statements against interest. *See Smith*, 744 F.2d at 1366 & n. 7. The parties in *Smith*, however, did not challenge the admissibility of the statements as ones against interest, and we did not elaborate the basis for our holding. The *Smith* footnote, therefore, is dictum.

Other cases, however, are more helpful in determining whether Markle's statements were admissible under Rule 804(b)(3). In *United States v. Lilley*, 581 F.2d 182 (8th Cir.1978), for example, we explained that only those portions of a statement that are truly against the declarant's interest are admissible under Rule 804(b)(3). Any portion of a statement not against interest must be edited out or the whole statement is inadmissible. *Id.* at 188. The court should examine the circumstances surrounding the statement to determine which portions of the statement were truly against interest. *Id.* In *Lilley*, the defendant's husband was arrested for uttering a forged check and interrogated by the police. Although he admitted to forging a signature on the back of the check and cashing it, the husband claimed that he did so only on his wife's insistence and was drunk at the time. *Id.* at 185. We held that the portions of the husband's statement implicating his wife were inadmissible in a prosecution against her because these portions were not against the husband's interest when made. The statement's circumstances indicated that the husband was attempting to minimize his role in the offense and shift suspicion from himself to his wife. *Id.* at 187–88.

The issue here, therefore, is whether those portions of Markle's statements implicating Geldermann were truly against his interest when made. We believe they were not. Stephens had accused Markle of serious fraud and had begun negotiations with Markle to settle its claims against him. Although Markle's statements admitting to the fraud were clearly against his interest, his statements implicating Geldermann were not necessarily so. Under the circumstances, it is possible that Markle was attempting to shift Stephens' attention from himself to Geldermann and thereby improve his position with Stephens in the negotiations. As such, his statements do not contain the indicia of reliability necessary for admission under Rule 804(b)(3).

Nonetheless, we have reviewed the record and conclude that the error was harmless. Substantial evidence existed to demonstrate that Geldermann facilitated Markle's scheme. In direct violation of federal regulations, Geldermann employees failed to require Markle to declare account numbers when placing orders. Moreover, internal Geldermann memoranda indicated that Geldermann actively concealed the existence of the McCambridge Account from Stephens and implied that Geldermann suspected or knew Markle may have been acting improperly. The improper admission of Markle's statement that he had "help" from Geldermann was, therefore, harmless.

**B. Compensatory Damages**

■ Geldermann contends that the evidence at trial was not sufficient to support the compensatory damages that the jury awarded to Stephens. Before addressing Geldermann's specific objections, however, we must determine whether to apply a federal or Illinois standard of review. This court has held that in reviewing the sufficiency of the evidence in a diversity case, the state standard of review applies where the verdict is based on a state claim. *E.g., Lockley v. Deere & Co.*, 933 F.2d 1378, 1389 (8th Cir.1991); *City Nat. Bank of Fort Smith v. Unique Structures, Inc.*, 929 F.2d 1308, 1314 (8th Cir.1991). The proper standard of review in the present case, therefore, turns on whether the jury's verdict is based on federal or state law.

The jury here considered both federal and state law claims, but did not expressly identify the claims on which it found Geldermann liable to Stephens. We are not, however, completely without guidance as to the basis of the jury's verdict. The jury's award of compensatory damages could have been based on either federal or state law, but its award of punitive damages required a finding against Geldermann on at least one state law claim. Thus, although the precise basis of the jury's verdict is uncertain, it is certain that the verdict was based at least in part, if not solely, on state law. Because the federal and state standards of review governing Geldermann's particular objections are essentially the same, we see no reason not to apply Illinois law in reviewing the jury's compensatory award.

■ Geldermann initially contends that Stephens failed to prove Geldermann's action proximately caused any losses in the Stephens Account. According to Geldermann, Stephens' compensatory damages are limited to the profits contained in the McCambridge Account, which represent profits that would have been placed in the Stephens Account had Markle not diverted them. Under Illinois law, an appellate court should reverse a jury's proximate cause finding only where the evidence, "when viewed most favorably to the party prevailing in the trial court, ... so overwhelmingly favors the appellant that no contrary verdict could stand." *York v. Stiefel,* 99 Ill.2d 312, 76 Ill.Dec. 88, 93, 458 N.E.2d 488, 493 (1983); *see Rainey v. City of Salem,* 209 Ill.App.3d 898, 154 Ill.Dec. 463, 468, 568 N.E.2d 463, 468, *appeal denied,* 141 Ill.2d 559, 162 Ill.Dec. 507, 580 N.E.2d 133 (1991). We do not believe this standard has been met here.

■ The evidence, when viewed most favorably to Stephens, provides sufficient support for the jury's conclusion that Geldermann's actions proximately caused damages to Stephens exceeding the profits contained in the McCambridge Account. In particular, Stephens presented an expert witness, Edward Horwitz, who testified about Markle's trading activities. Horwitz concluded that Markle was not simply skimming-off profitable trades otherwise made in the normal course of business. Horwitz explained that because Markle defrauded Stephens by allocating certain profitable trades to the McCambridge Account, he needed to initiate trades in order to create opportunities for such allocation. Markle, therefore, had an incentive to order trades so as to maximize the opportunities for profitable transactions, irrespective of the net profitability of the trades as a whole. Markle then allocated certain profitable trades to the McCambridge Account, and the remainder, whatever the net gain or loss, to the Stephens Account. Thus, according to Horwitz, the profits that Markle allocated to the McCambridge Account did not accurately reflect the total damage to Stephens. Transcript at 664–66. Although Geldermann presented experts who disagreed with Horwitz, his testimony is sufficient to support the jury's conclusion that Stephens' damages exceeded the profits Markle allocated to the McCambridge Account. *Cf. York,* 76 Ill.Dec. at 92–93, 458 N.E.2d at 492–93 (emphasizing testimony of plaintiff's expert witness, which was contested by defendant's experts, in refusing to reverse jury's finding of proximate cause).

Geldermann criticizes Horwitz's testimony, noting that he discussed various theories concerning Markle's trading activities and even admitted that it was impossible to determine exactly which losses in the Stephens Account were attributable to Markle's scheme. Transcript at 664–65. These objections, however, are matters for the jury as fact-finder to consider in evaluating the expert's opinion. We have reviewed the evidence at trial and do not believe that it so overwhelmingly favored Geldermann so as to require reversal.

■ Geldermann further contends that even if its actions did proximately cause some of the losses in the Stephens Account, the damages awarded to Stephens were unduly speculative because the jury could not ascertain the exact amount of these losses. Illinois law, however, does not require that the jury be able to ascertain

814

damages with absolute mathematical certainty. *Rhodes v. Sigler*, 44 Ill.App.3d 375, 2 Ill.Dec. 626, 630, 357 N.E.2d 846, 850 (1976); *Meyer v. Buckman*, 7 Ill.App.2d 385, 129 N.E.2d 603, 613 (1955). All that is needed is a reasonable basis, established with a fair degree of probability, for the jury to assess the damages. *Tower Oil & Technology Co. v. Buckley*, 99 Ill.App.3d 637, 54 Ill.Dec. 843, 851, 425 N.E.2d 1060, 1068 (1981).

■ We believe that the jury had a reasonable basis to compute damages here. In addition to Horwitz's testimony, for example, the jury heard testimony that Markle's trading strategy would have led him to make many of the trades regardless of his scheme to defraud Stephens and that his skill as a trader was poor. Transcript at 1911–13, 1941. The chief executive officer of Stephens admitted that he knew the Stephens Account was losing money, yet allowed Markle to continue trading it. *Id.* at 771–72. The jury, therefore, could have reasonably concluded that a certain degree of loss in the Stephens Account was inevitable, but that Markle's scheme increased the amount of this loss. As such, the jury had a reasonable basis to assess damages and we refuse to upset its assessment as speculative. *Cf. Tower Oil*, 54 Ill.Dec. at 851, 425 N.E.2d at 1068 (although exact amount of lost profits is unascertainable, reasonable basis existed for jury to estimate damages).

## C. Punitive Damages

■ Geldermann also contends that the district court erred in presenting the issue of punitive damages to the jury and in failing to adequately review the award for excessiveness. The parties agreed at trial that Illinois law governed the award of punitive damages. Under Illinois law, the trial court decides as a matter of law whether punitive damages are justified in a particular case and, if so, submits the issue to the jury, which determines the measure of damages. *Dethloff v. Zeigler Coal Co.*, 82 Ill.2d 393, 45 Ill.Dec. 175, 183, 412 N.E.2d 526, 534 (1980), *cert. denied*, 451 U.S. 910, 101 S.Ct. 1980, 68 L.Ed.2d 299

(1981); *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 565, 384 N.E.2d 353, 359 (1978). The court's decision is subject to review only for abuse of discretion. *E.g., Motsch v. Pine Roofing Co.*, 178 Ill.App.3d 169, 127 Ill.Dec. 383, 388, 533 N.E.2d 1, 6 (1988); *Warren v. LeMay*, 142 Ill.App.3d 550, 96 Ill.Dec. 418, 437, 491 N.E.2d 464, 483 (1986). Punitive damages are appropriate "when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Kelsay*, 23 Ill.Dec. at 565, 384 N.E.2d at 359. In particular, punitive damages are proper for fraud where the fraud is accompanied by aggravating circumstances. *Beaton & Assocs. v. Joslyn Mfg. & Supply Co.*, 159 Ill.App.3d 834, 111 Ill.Dec. 649, 656, 512 N.E.2d 1286, 1293 (1987).

■ We do not believe the district court abused its discretion in submitting the issue of punitive damages to the jury on a theory of either fraud or conspiracy to defraud. As discussed above, there was substantial evidence that Geldermann facilitated Markle's scheme and made positive efforts to prevent Stephens from learning about the McCambridge Account. As such, we agree with the district court that the evidence was sufficient under Illinois law to submit the issue of punitive damages to the jury. *Cf. Federal Deposit Ins. Corp. v. W.R. Grace & Co.*, 877 F.2d 614, 623 (7th Cir.1989) (concealment of fraud sufficient to support award of punitive damages under Illinois law), *cert. denied*, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990).

Geldermann next claims that the district court failed to adequately review the award of punitive damages for excessiveness as required by *Pacific Mut. Life Ins. Co. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Geldermann urges us to follow our decision in *Robertson Oil Co. v. Phillips Petroleum Co.*, 930 F.2d 1342 (8th Cir.1991). In *Robertson*, the district court summarily denied a defendant's motion for remittitur of punitive damages. We held

that under the circumstances, it was impossible to determine whether the district court's review of the punitive damages award was adequate and we remanded the case, directing the district court to articulate its basis for denying the defendant's motion. *Id.* at 1347.

Although the district court summarily rejected both Geldermann's objection at trial and its post-trial motion for remittitur, any violation of the standard contained in *Haslip* was harmless. Geldermann concedes that the essential basis of its trial objection and post-trial motion for remittitur was that the issue of punitive damages should not have been presented to the jury, not that the jury's award was excessive assuming punitive damages were justified. Its position has not changed on appeal. As such, even if the district court failed to adequately review the amount of the award, the error was harmless because we have held that the issue of punitive damages was properly submitted to the jury.[3]

■ Geldermann responds by arguing that any award of damages is excessive if the issue should not have been submitted to the jury, and, thus, the court's failure to review the award as *Haslip* requires constitutes reversible error. The Supreme Court's opinion in *Haslip*, however, does not concern the standards governing submission of punitive damages to a jury. Instead, it addresses the restraints that must be placed on the jury's consideration of damages. *See Haslip*, 111 S.Ct. at 1044–46. *Haslip*, therefore, only requires a trial court to conduct a post-verdict review of the amount of the jury's award, not its initial decision to submit the issue of punitive damages to a jury.

### D. RICO

On cross-appeal, Stephens argues that the district court erred in granting Geldermann summary judgment as to Stephens' RICO claim. The district court held, among other things, that Stephens failed to allege an enterprise distinct from the alleged pattern of racketeering activity. We agree. Our review of the district court's holding is de novo. *E.g., AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987).

■ The essential characteristics of an enterprise under RICO include: "(1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering." *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 995 (8th Cir.1989) (citing *United States v. Kragness*, 830 F.2d 842, 855 (8th Cir.1987)). In particular, "an enterprise cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts." *United States v. Bledsoe*, 674 F.2d 647, 664 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982).

■ In its complaint, Stephens alleged that an association-in-fact enterprise existed between Markle, Geldermann, and certain Geldermann employees. The Geldermann employees included those responsible for taking and filling Markle's trade order, their supervisors, and an employee responsible for reviewing opening account documentation. Amended Complaint ¶ 69–71. This group, however, had no structure independent of the alleged racketeering activity. The only common factor that linked all these parties together and defined them as a distinct group was their direct or indirect participation in Markle's scheme to

---

3. Geldermann also urges us to follow our decision in *Union Nat. Bank of Little Rock v. Mosbacher*, 933 F.2d 1440 (8th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 870, 116 L.Ed.2d 775 (1992). In *Union National*, the defendant challenged a punitive damages award, arguing only that its due process rights had been violated, not that the award was excessive. *Id.* at 1447–48 & n. 1. Concerned that the jury instructions failed to sufficiently limit the jury's

discretion, we remanded the case rather than address the issue on appeal. We did so, in part, because the issue was better suited for initial examination by the district court. *See id.* at 1448. Although Geldermann's objection is similar to the defendant's in *Union National*, the present case is distinguishable because Geldermann's due process objection concerns the actions of the trial court. As such, the objection is one we may adequately address on appeal.

defraud Stephens. Although it is true that each member of this group carried on other legitimate activities, these activities were not in furtherance of the common or shared purpose of the enterprise and, thus, were not acts of the enterprise. Stephens, consequently, failed to prove the existence of an enterprise that extended beyond the minimal association surrounding the pattern of racketeering activity.

Stephens asserts that we should follow our decision in *United States v. Lemm,* 680 F.2d 1193, 1201 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983), where we held that an arson ring constituted an enterprise with a structure distinct from that inherent in its pattern of racketeering. In *Lemm,* the arson ring acquired and insured property, had the property burned, and then filed fraudulent insurance claims. *Id.* at 1197. We concluded that the arson ring had a structure distinct from the predicate acts of racketeering, which were mail fraud, because the arson ring carried on various other activities, such as purchasing, repairing, and destroying property, and could have accomplished its fraud without the use of the mails by hand delivering its insurance claims. *Id.* at 1201.

The present case, however, is distinguishable. Absent the predicate acts of wire and mail fraud, the association-in-fact enterprise which Stephens alleged had no form or structure. Unlike the arson ring in *Lemm,* which was united and defined by activities independent of the predicate acts of mail fraud, the enterprise here was linked and essentially defined by the daily interstate telephone calls and confirmation mailings between Little Rock and Chicago. These acts, moreover, were essential to Markle's scheme to defraud Stephens. Remove these predicate acts of racketeering, and the alleged association-in-fact evaporates.   .

### E.  Set–Off

▆▆▆ Stephens also argues that the district court erred in setting-off against its damage award the $600,000 McCambridge received in the settlement between Stephens and McCambridge. Stephens contends that the settlement resolved valid claims by both parties to the McCambridge Account. The district court, however, held that Stephens had acted imprudently in failing to preserve the status quo until the jury reached its verdict, which verdict indicated that the funds in the McCambridge Account belonged solely to Stephens as the proceeds of Markle's fraud. The court, therefore, concluded that Geldermann was entitled to an equitable set-off equal to the amount Stephens voluntarily conceded to McCambridge. Albeit for slightly different reasons, we agree.[4]

Stephens attempts to analogize its situation to that of a plaintiff who settles with one of two tortfeasors and then later acquires a judgment against the other. The plaintiff's recovery from the second tortfeasor is reduced only by the amount it received from the first tortfeasor. Thus, Stephens' damages should only have been reduced by the $600,000 that it received in the settlement with McCambridge. The district court correctly recognized that Stephens' analogy is inapposite. McCambridge was not a tortfeasor; on the contrary, she was also an alleged victim of Markle's fraud who sought to recover damages from Geldermann for the money she gave Markle to invest. The $1,200,000 in the McCambridge Account represented the funds remaining from Markle's alleged fraud against both Stephens and McCambridge.

Although it was not clear what portion of funds in the McCambridge Account belonged to Stephens or McCambridge, it was clear, as a matter of equity, that Geldermann's liability to either Stephens or McCambridge should be set-off by the amount of the funds belonging to that party. This prevents double recovery by either Stephens or McCambridge. *Cf. Garcia v. Chicago & N.W. Ry.,* 79 Ill.App.3d

---

4. For the same reasons that we applied Illinois law in reviewing the jury's compensatory damages award above, we apply Illinois law in reviewing the district court's decision. to grant Geldermann's request for a set-off.

757, 35 Ill.Dec. 79, 84–85, 398 N.E.2d 1029, 1034–35 (1979) (defendant entitled to reduction of damage award by amount defendant previously paid to plaintiff). The jury's finding that Geldermann was liable only to Stephens effectively established that the funds had belonged solely to Stephens. Consequently, Geldermann was entitled to have its liability to Stephens reduced by the total amount that was in the McCambridge Account. The district court instructed the jury to reduce any award of damages to Stephens only by the amount of money that Stephens had already recovered. In other words, the $600,000 Stephens had received in the settlement. The court, therefore, acted properly in further setting-off the award by the $600,000 McCambridge received.[5]

Stephens contends that Geldermann is barred from asserting any equitable set-off by the doctrine of unclean hands. The Illinois courts, however, do not favor the doctrine of unclean hands and emphasize that its purpose is not "to prevent equity from doing complete justice." *Jaffe Commercial Fin. Co. v. Harris,* 119 Ill.App.3d 136, 74 Ill.Dec. 722, 726, 456 N.E.2d 224, 228 (1983) (citing *Shadden v. Zimmerlee,* 401 Ill. 118, 81 N.E.2d 477 (1948)). In particular, the doctrine applies only where the party seeking equitable relief has committed misconduct in connection with the very transaction at issue. *Long v. Kemper Life Ins. Co.,* 196 Ill. App.3d 216, 142 Ill.Dec. 925, 927, 553 N.E.2d 439, 441 (1990); *Jaffe,* 74 Ill.Dec. at 726, 456 N.E.2d at 228. Application of the doctrine is within the trial court's discretion. *Long,* 142 Ill.Dec. at 927, 553 N.E.2d at 441.

We see no abuse of discretion here. Geldermann contends that, as a matter of equity, the settlement between Stephens and McCambridge should not alter its liability to Stephens. Although Geldermann indeed was a wrongdoer towards Stephens, it committed no misconduct in connection with the McCambridge Account after Markle's fraud was uncovered. On the contrary, Geldermann voluntarily turned the funds over to Stephens for safe-keeping. As such, the doctrine of unclean hands does not bar Geldermann's request for an equitable set-off based on the funds contained in the McCambridge Account at the time Geldermann turned the account over to Stephens.

## III. CONCLUSION

For the reasons discussed above, we affirm the jury's awards of compensatory and punitive damages to Stephens as well as the district court's orders dismissing Stephens' RICO claim and granting Geldermann a set-off against Stephens' compensatory damage award.

---

5. We note that our analysis does not discourage parties in Stephens' and McCambridge's situation from settling their dispute. By settling, Stephens and McCambridge insured that each would receive a minimum amount of funds in the McCambridge Account regardless of the jury's verdict. For example, had McCambridge not agreed to the settlement and received a similar verdict in Stephens' suit against her, she would not have been able to recover any funds from the account. As with any settlement, though, the parties take the risk that the jury's verdict would have been more favorable. Stephens chose not to wait for the verdict and must accept the consequences. It cannot now seek to circumvent the risks inherent in settling by seeking additional recovery from Geldermann. This would constitute double recovery. A contrary holding would encourage parties in Stephens' and McCambridge's situation to enter collusive settlements so as to maximize their potential collective recovery from a third party.