**Kathleen E. PENNINO, Plaintiff,**

v.

**Helen SELIG, et al., Defendants.**

**No. 02–CV–6167.**

United States District Court,
W.D. Arkansas,
Hot Springs Division.

Jan. 21, 2003.

Kathleen E. Pennino, pro se.

William Webster Darling, II, Senior Counsel, Entergy Services, Inc., Little Rock, AR, Richard T. Donovan, Rose Law Firm, Little Rock, AR, Reed R. Edwards, Quattlebaum, Grooms, Tull & Burrow PLLC, Little Rock, AR, David M. Glover, Glover, Glover & Roberts, Malvern, AR, Timothy W. Grooms, Quattlebaum, Grooms, Tull & Burrow PLLC, Little Rock, AR, Dan Hake, Diane Brenkus, Benton, AR, D. Scott Hickam, Attorney at Law, Hot Springs, AR, J. Leon Holmes, Quattlebaum, Grooms, Tull & Burrow PLLC, Little Rock, AR, Velma—Magoon, Hot Springs, AR, Ralph C. Ohm, Attorney at Law, Hot Springs, AR, Russell Perguson, Pearcy, AR, Mark Roberts, Attorney at Law, Malvern, AR, B J Smith, Hot Springs, AR, James H. Smith, Attorney at Law, Little Rock, AR, James Howard Smith, Attorney at Law, Little Rock, AR, Gregory D. Taylor, McHenry & McHenry Law Firm, Little Rock, AR, for Defendants.

### MEMORANDUM OPINION & ORDER

DAWSON, District Judge.

On this 21st day of January 2003, there comes on for consideration the motion to dismiss filed by separate defendant Malvern National Bank. (Doc. # 20). Plaintiff's 47–page, verified complaint, exclusive of exhibits, purports to allege a claim or claims under the Organized Crime Control

Act of 1970, Racketeer Influenced and Corrupt Organizations (RICO), 18 U.S.C. §§ 1961, et seq. Plaintiff has named an assortment of 35 defendants including corporations and natural persons. Many of the defendants are named in both their capacities as private individuals and public officials. The public official defendants represent the Garland County Sheriff's Department; the City of Hot Springs, Arkansas; the Hot Springs Police Department; the Mayor; the City Board of Directors; the City Manager; the City Attorney; and the Housing Code Department. Also named as defendants are a public utility company as well as the movant, a federally chartered banking institution. Plaintiff claims compensatory and punitive damages, as well as treble damages and attorneys' fees and costs. In its Rule 12(b)(6) motion to dismiss, separate defendant Malvern National Bank (the Bank) contends that, despite its length, the complaint fails to state facts upon which relief can be granted and should be dismissed. For the reasons set forth within this opinion and order, the Bank's motion will be granted, and all claims against the Bank will be dismissed.

## I. Background.

For purposes of ruling on this motion only, we accept as true all material facts alleged in the complaint and construe them in a light most favorable to the Plaintiff. The alleged but unproven facts would show that between May of 1994 and July 1996, Plaintiff purchased several rental properties in and around an area in downtown Hot Springs where (now former) President Bill Clinton lived as a young boy. Everything seemed to be going well for the Plaintiff until February 1999, when she became interested in purchasing the Goddard Hotel property located at 830 Central Avenue in downtown Hot Springs. The hotel property, largely unoccupied and in a state of disrepair, consisted of 150 hotel rooms, 13 storefronts, two apartments, and a separate house at the rear of the building.

The Goddard Hotel was originally built in the 19th century. In June 1992, the hotel was donated by a previous owner to Evergreen Presbyterian Ministries, a non-profit Louisiana corporation. Evergreen planned to renovate the dilapidated property and turn it into an elder-care and rehabilitation facility. These well-intentioned plans never reached fruition, allegedly because Evergreen encountered problems obtaining necessary permits from the City of Hot Springs.

Defendant Helen Selig became the Mayor of Hot Springs in March of 1994. While serving as Mayor, Ms. Selig recommended to the City Board of Directors that defendant Kent Myers be hired as the City Manager. Defendant Bart Jones was hired by Ms. Selig to serve as the Housing Code Administrator of the Hot Springs Housing Code Department.

Plaintiff alleges that, while acting as mayor of the City of Hot Springs, Ms. Selig targeted the Goddard Hotel property as the "ideal location and the perfect property (by reason of its deteriorated condition) for whatever plans might ultimately be developed by the City of Hot Springs to honor, and derive economic benefit from, the presidency of Bill Clinton." (Compl.¶ 48.) To this end, the Plaintiff alleges, Ms. Selig "made certain that the City of Hot Springs refused all attempts by Evergreen to renovate and develop the Goddard Hotel." *Id.*

An additional allegation is that Ms. Selig used her real estate company, separate defendant Selig–Smith, Inc., to obtain a commercial real estate listing on the property when Evergreen decided to sell. It is alleged that Ms. Selig did not really want to sell the property. Plaintiff claims that Ms. Selig's true motive in obtaining the

listing was to prevent the property from being sold so that it could be acquired by the City once the Clinton presidency came to an end. The property was listed for $350,000.

In February 1999, during President Clinton's second term of office, Plaintiff entered into negotiations to purchase the hotel property. Plaintiff claims that she was subjected to heavy discouragement and numerous roadblocks thrown up by Ms. Selig and her son, separate defendant Scott Selig, however Plaintiff was undeterred and made a few formal, written, offers to purchase the hotel property. During the negotiation process, defendant/realtor Scott Selig told Plaintiff that all of the contents of the hotel, including all furniture and personal property, would be conveyed in the sale. None of the written offers prepared by Scott Selig specifically excluded any personal property or fixtures. Defendant Helen Selig signed each of the written offers as supervising broker. On July 1, 1999, Evergreen accepted Plaintiff's offer to purchase the hotel property for $300,000. Plaintiff was to make a $50,000 down-payment with the seller to finance the unpaid balance. The parties agreed to a closing date of August 1, 1999.

Between the contract date and the closing date, the hotel property was ransacked and looted on two occasions with no sign of forced entry. According to the Plaintiff, Evergreen did not have the property insured and did not report the theft and damage to authorities. The allegations continue as follows:

- The Hot Springs Police Department would not accept Plaintiff's complaint about the theft and property damage.
- The on-site building manager, defendant Nelson, and the Seligs denied any knowledge of the identity of the responsible party.
- Although Ms. Selig seemed sympathetic and told Plaintiff that she did not have to go through with the closing, Ms. Selig did not volunteer to return Plaintiff's substantial downpayment.
- Fearing the loss of her deposit and/or a lawsuit, Plaintiff went ahead and closed the transaction and became the owner of the Goddard Hotel on July 30, 1999.
- Upon closing, Plaintiff received only three of the 17 keys that went to the property.
- After hiring a locksmith and breaking into some of the locked areas of the hotel, Plaintiff discovered even more theft and property damage.
- Plaintiff claims that she again attempted to report the vandalism to local law enforcement, but the Hot Springs Police Department continued to refuse to allow Plaintiff to file a complaint.
- Plaintiff estimates the total damages sustained in the July 1999 vandal attacks to be in excess of $500,000.

Plaintiff claims that everyone knew or should have known that Ms. Selig and separate defendant Velma Magoon were responsible for the vandalism. Plaintiff alleges that Ms. Magoon is a close, personal friend of Ms. Selig, a member of the Democratic Central Committee, and a convicted felon. According to Plaintiff:

- In 1998 when it looked as if President Clinton might leave office early, Ms. Selig arranged for Ms. Magoon to enter into a contract to purchase the Goddard Hotel in order to reserve it for use by the City.
- It is alleged that, while the contract was pending and with the seller's permission, Ms. Magoon had all of the hotel locks changed. A complete set

of new keys was provided to the hotel property manager.

- Ms. Magoon also obtained permission to store numerous items of furniture and personal property inside the hotel.
- Plaintiff contends that, when it became clear that President Clinton would not resign his office and there was no need for an early acquisition of the Goddard Hotel, Ms. Magoon backed out of the real estate transaction but kept all of the keys.
- According to Plaintiff, it was Ms. Magoon and Ms. Selig who had the furniture removed and the hotel vandalized in an effort to force Plaintiff to back out of buying the property.

Plaintiff contends that when their initial plan to prevent the sale of the hotel was unsuccessful, Ms. Selig and Ms. Magoon "conspired to do whatever it took to get the Goddard Hotel away from plaintiff, without having to pay her for it." (Compl.¶ 96.) Plaintiff claims that Selig and Magoon:

> conspired and schemed with the other defendants named herein, along with other persons, in a systematic and vicious campaign against plaintiff, with the intent to injure plaintiff, deprive her of her income, destroy her business, and cause her to lose the Goddard Hotel, and her other properties as well.

*Id.*

According to Plaintiff, the hotel continued to be burglarized on a regular basis after she became the owner. Plaintiff claims that:

- The break-ins continued with no sign of forced entry even after Plaintiff had all of the locks changed.
- Plaintiff's complaints to law enforcement went uninvestigated. Plaintiff alleges that defendant Police Officer Kirkland "accused Plaintiff of harassing the police, and he told her that if she kept it up, he would throw her in jail." (Compl.¶ 99.)
- Defendant Police Sergeant McCormick allegedly told Plaintiff that he would never investigate her complaints.
- In February 2000, after defendant Nelson moved out of his apartment and storefront at the hotel, Plaintiff alleges she found a hidden trap door which "was obviously where the burglars had been getting into the ... hotel ..." Plaintiff also claims that Defendant Nelson had "hot wired" his quarters so that he could freeload off the hotel's electricity bill. (Compl.¶ 105.)

In the fall of 1999, Defendant Housing Code Administrator Bart Jones recommended defendant Perguson as a prospective tenant to Plaintiff. Plaintiff alleges that a few months after becoming her tenant, Perguson attacked the property manager with a board causing serious bodily injury. Defendant Perguson then allegedly caused Plaintiff's travel trailer to explode by turning on a propane gas tank valve. Luckily, no one was inside the trailer when it was destroyed. Defendant Perguson also left the water running in the house he was renting, causing the residence to flood.

The Plaintiff further alleges that in the winter and spring of 1999–2000:

- Defendant police officers McCormick, Jones, and Kirkland harassed the shopkeepers renting storefronts in the Goddard Hotel and their customers.
- The storekeepers were wrongfully and unjustifiably stalled and hassled by the Hot Springs Code Department about needed permits and licenses.
- New shopkeepers were wrongly refused necessary occupancy orders by the City of Hot Springs.

- All shopkeepers were encouraged by City officials and employees to leave the Goddard Hotel and locate their businesses elsewhere.
- In January 2000, Plaintiff's business partner ended his relationship with Plaintiff allegedly because of the fear created by the burglaries and the harassment by the police and city officials.
- Beginning in April 2000, plaintiff began losing commercial tenants in the hotel.

Plaintiff claims that she was falsely charged and ticketed for numerous offenses, and subjected to false arrests and incarcerations as follows:

- In August 2000, defendant Hot Springs Housing Code Administrator Jones demanded that Plaintiff move an old car that was parked at the rear of one of her properties. When she complied and had the car pushed into the street for towing, defendant Police Officer Kirkland issued her a citation for obstructing a highway.
- When the car's owner, Mr. Jackson, learned what had happened, he threatened to kill Plaintiff and her children and burn their house down.
- Defendant Police Officer Mike Jones witnessed the threats being made and issued a ticket to Mr. Jackson for second degree terroristic threatening.
- An hour later, Officer Jones returned to the scene and falsely issued an identical citation to Plaintiff.
- A few days later, Mr. Jackson beat Plaintiff's property manager, Mr. Ponce.
- Defendant Officer McCormick falsely arrested Mr. Ponce and took him to jail.
- Plaintiff complained to defendant City Manager Myers' office about the harassment by the police and Housing Code Administrator Jones. .

- In response, the Housing Code enforcement authorities went over to the Goddard Hotel, threatened the remaining storekeepers, and demanded that they move immediately or lose their electricity.

The Plaintiff contends that separate defendants Ray, Espinoza, Hake, Bleskins, and Harvey were all tenants of hers at some time. Each of them stopped paying rent; fought with Plaintiff's employees and other tenants; caused extensive damage to their rented properties; and refused to move voluntarily. When Plaintiff complained to the police, she was referred to the Garland County Prosecuting Attorney, who would in turn refer her back to the police. Plaintiff's complaints to defendant City Manager Myers and defendant members of the City Board of Directors were ignored.

On May 27, 2000, Plaintiff claims that she called the police when she caught defendant/tenant Martini ripping up the storefront he had rented at the Goddard. The responding police officer wrote two citations to Mr. Martini for criminal mischief and harassment. "When defendant Police Sgt. Mike McCormick learned what had happened, he got the two tickets and tore them up." (Compl. ¶ 110.)

Plaintiff alleges that in the Spring of 2001, defendant/tenant Henry Hover "spent day and night tearing up the Goddard Hotel. Mr. Hover was encouraged to tear up the hotel by defendant Housing Code Inspector Stauder and other city employees . . . . and he threatened to kill plaintiff if she got anywhere near him." (Compl.¶ 125.) The Hot Springs Police refused to arrest Hover. When Plaintiff and her lawyer finally convinced defendant Police Chief Ashcraft to send an officer over to the hotel and arrest Mr. Hover, Mr. Hover was no where to be found. It is

alleged that Mr. Hover caused in excess of $100,000 damage to the hotel property.

It is alleged that the Hot Springs Housing Code Department added to Plaintiff's woes as follows:

- Department personnel repeatedly had employees of defendant Entergy Corporation shut off the electricity to Plaintiff's rental units on Friday evening and reinstate power on Monday morning. The power would be cut off without just cause in an effort to "run off Plaintiff's tenants." (Compl.¶ 121.) The shut-offs continued despite Plaintiff's complaints to the local manager of the defendant electric company.

- Housing Code Department personnel also broke into Plaintiff's rental properties in order to perform inspections. These break-ins were performed pursuant to advice from the defendant City Attorney, David White.

- In April 2001, defendant Housing Code Administrator Jones served Plaintiff with fraudulent condemnation notices on some of her rental houses.

- Although Jones claimed that Plaintiff's tenants had consented to the inspections that led to the condemnation notices, Plaintiff alleges that each condemned property was vacant, and that the purported consent forms were signed by the same person who had been forging Plaintiff's signature on her stolen checks.

- Plaintiff claims that expert handwriting analysis shows that the person forging her checks and the consent forms was defendant Frank Ray.

- According to Plaintiff, the Hot Springs Housing Code Department has condemned approximately 1,400 properties since 1995. Plaintiff alleges that "many of the condemnations were done without proper cause, without due process, without just compensation, and in violation of the various

property owners' rights under law." (Compl.¶ 144.)

Plaintiff relates that her personal residence has been burglarized more than 15 times. In connection with the burglaries, Plaintiff claims that:

- She began to notice that the burglaries followed an identifiable pattern: the electricity would be turned off for no reason; Plaintiff and her children would spend the night elsewhere; and their home would be burglarized in their absence.

- This alleged pattern continued even after Plaintiff complained to the local manager of the defendant electric company, Entergy Corporation.

- Plaintiff also filed complaints with the Garland County Sheriff's office. Plaintiff alleges that defendant Sheriff Larry Selig is defendant Ms. Selig's husband and defendant John Selig's brother.

- No investigation was conducted and no arrests were made, even though Plaintiff informed Sheriff Selig that she suspected John Selig and defendant Mr. Ray of being involved in the burglaries.

- Plaintiff discovered that her checkbook was stolen during one of the burglaries.

- Plaintiff alleges that she had the checking account at defendant Malvern National Bank closed on December 19, 2000.

- Someone began forging Plaintiff's checks and presenting them to various businesses around town.

- Plaintiff attempted to "get the bank to give proper notice to the local check clearing company, Check Rite, that [her] account had been closed" so that local merchants would know not to take the checks. (Compl.¶ 123.)

It is alleged that defendant Malvern National Bank refused to give such notice and that Plaintiff's credit has been "continuously and adversely affected by the hot checks and by Malvern National Bank's wrongful refusal to help stop the hot checks by giving proper notice..." *Id.*

Plaintiff contends that several of the defendants, including defendants Helen Selig, Kent Myers, Bart Jones, and Jack Greenway, interfered with Plaintiff's plans to sell the hotel on three or four separate occasions by intimidating buyers and causing them to decline to make offers or to withdraw offers that had been extended.

Plaintiff also claims that in 2002, defendants B.J. Smith and Jeannie Veltons "knocked on the doors of plaintiff's [rental] properties, hounded and harassed plaintiff's tenants, told the tenants to stop paying rent to plaintiff, and told the tenants to get out of plaintiff's properties." Plaintiff alleges that Mr. Smith is Helen Selig's brother.

Plaintiff claims that "defendants Mrs. Selig, Ms. Magoon, and City Manager Myers directed and controlled, and acted in concert with, the other defendants named herein...." (Compl.¶ 38.) Plaintiff alleges that the City of Hot Springs and Garland County are both "enterprises" as that term is defined in the RICO statute, and that all named defendants were an association-in-fact enterprise whose purpose was to "defraud and obtain money or property from plaintiff." (Compl.¶¶ 149–154.) It is alleged that the defendants conducted the affairs of these enterprises through a pattern of racketeering activity. (Compl.¶ 155.) Plaintiff claims that the defendants' wrongful acts have caused her to lose income and profits from her rental property business and have resulted in the loss of assets and investment properties by foreclosure. (Compl.¶ 156.)

## II. Standard of Review.

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a complaint may be dismissed for failure to state a claim upon which relief can be granted. In ruling on a 12(b)(6) motion, the court must review the allegations contained in the complaint and construe them in a light most favorable to the plaintiff, and all factual allegations must be accepted as true. *See Haberthur v. City of Raymore, Missouri,* 119 F.3d 720 (8th Cir.1997). A complaint should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would demonstrate an entitlement to relief." *Springdale Education Association v. Springdale School District,* 133 F.3d 649, 651 (8th Cir.1998). "At a minimum, however, a complaint must contain facts sufficient to state a claim as a matter of law and must not be merely conclusory in its allegations." *Id.* Dismissal under Rule 12(b)(6) "serves to eliminate actions which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles,* 244 F.3d 623, 627 (8th Cir. 2001) (citation omitted).

## III. Discussion.

### A. Civil RICO Generally

The Racketeer Influenced and Corrupt Organizations Act (RICO) provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). The Plaintiff alleges that she was injured...in her business and property...by reason of the violations of 18 U.S.C. §§ 1962(c) and (d) ... (Compl. ¶ 156.) Subsection (c) of § 1962 forbids "any person employed by or associated with any enterprise ... to conduct or participate ... in the conduct of such enter-

prise's affairs through a pattern of racketeering activity..." To state a claim for civil liability under § 1962(c), one must allege facts showing "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)(footnote omitted). *See also United HealthCare Corp. v. Amer. Trade Ins. Co.,* 88 F.3d 563 (8th Cir.1996)(holding RICO plaintiff must allege existence of an enterprise; defendant's association with the enterprise; defendant's participation in predicate acts of racketeering; and defendant's actions constitute a pattern of racketeering activity). Section 1962(d) makes it unlawful for "any person to conspire to violate any of the provisions of subsection ... (c) of [§ 1962]." To state a subsection (d) claim for conspiracy to violate the RICO statute, the Plaintiff must plead facts showing the existence of an "enterprise"; that defendant was associated with or employed by the enterprise; and that the defendant "objectively manifested an agreement to participate ... in the affairs of [the] enterprise." *United States v. Darden,* 70 F.3d 1507 (8th Cir.1996) (citations omitted).

After reviewing the complaint, the Bank's motion to dismiss, and the Plaintiff's response thereto,[1] and being well and sufficiently advised, the Court finds that the complaint fails to allege facts specific to Malvern National Bank sufficient to support the conclusory allegations contained in the RICO claims. Specifically, the complaint fails to allege facts demonstrating the conduct, enterprise, pattern, racketeering activity, and/or manifest agreement elements necessary to state a RICO claim(s) against Malvern National Bank.

**1.** The Bank's reply contains matters outside the pleadings and is excluded from consider-

### 1. Conduct

■ The "conduct" requirement extends liability only to those individuals who "participate in the operation or management of the enterprise itself." *Handeen v. Lemaire,* 112 F.3d 1339, 1347 (8th Cir.1997) (citing *Bennett v. Berg,* 710 F.2d 1361, 1364 (8th Cir.) (en banc) (announcing the "operation or management" test), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983)). In *Reves v. Ernst & Young,* 507 U.S. 170, 185, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993), the Supreme Court noted:

> [Section 1962(c)] cannot be interpreted to reach complete "outsiders" because liability depends on showing that the defendants conducted or participated in the conduct of the *"enterprise's* affairs," not just their *own* affairs. Of course, "outsiders" may be liable under § 1962(c) if they are "associated with" an enterprise and participate in the conduct of *its* affairs-that is, participate in the operation or management of the enterprise itself....

*Reves,* 507 U.S. at 184–85, 113 S.Ct. at 1173 (emphasis in original) (footnote omitted).

■ Setting aside the question of whether the complaint alleges the existence of an enterprise, the factual allegations concerning the Bank's conduct show that the Bank closed the Plaintiff's checking account upon her request and then refused to give account information directly to a local check-clearing company. The only conclusion one may reasonably infer from these allegations is that the Bank participated in the conduct of its own affairs, i.e: the business of banking. The complaint is devoid of any allegations demonstrating that the Bank participated in

ation in connection with the motion to dismiss.

the operation or management of the alleged "enterprise" whose purpose was to acquire the Goddard Hotel. For this reason alone, the motion to dismiss should be granted.

### 2. Enterprise

■ The "enterprise" element is satisfied by facts showing the existence of a legal entity or a "union or group or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An "association-in-fact" enterprise may be composed of individuals, corporations and/or other legal entities. To qualify as a RICO enterprise, the association-in-fact must exhibit three basic characteristics: (1) a common or shared purpose; (2) some continuity of structure and personnel (a formal or informal organization in which the participants function as a unit); and (3) an ascertainable structure distinct from that in a pattern of racketeering. *United States v. Darden,* 70 F.3d 1507, 1520 (8th Cir.1996); *Atlas Pile Driving v. DiCon Financial Co.,* 886 F.2d 986, 995–96 (8th Cir.1989) (citing *United States v. Kragness,* 830 F.2d 842, 855 (8th Cir.1987)). "[A]n enterprise cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts." *Stephens, Inc. v. Geldermann, Inc.,* 962 F.2d 808, 815 (8th Cir.1992) (citing *United States v. Bledsoe,* 674 F.2d 647, 664 (8th Cir.), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982)). The existence of an enterprise may be determined if "the enterprise would still exist were the predicate acts removed from the equation." *Handeen v. Lemaire,* 112 F.3d at 1352.

■ There are no facts alleged showing that the Bank may be associated with the City of Hot Springs or Garland County "enterprises." Nor may the Bank be included in an association-in-fact enterprise composed of all named defendants. No facts support the conclusion that all defendants shared the common purpose of getting the Goddard Hotel away from the Plaintiff without having to pay her for it or that each defendant worked in concert with the others to advance this goal. Finally, the existence of a wide-spread association-in-fact enterprise is not supported by facts demonstrating a structure distinct from what was necessary to perpetrate the alleged predicate acts engaged in by the numerous alleged members. Take away the alleged predicate acts, and the association-in-fact enterprise ceases to exist or, at least, its membership is dramatically reduced and excludes the Bank. As the complaint does not contain facts showing the existence of an enterprise that would include the Bank, the motion to dismiss should be granted.

### 3. Pattern

■ The "pattern" element requires the RICO plaintiff to allege facts demonstrating the defendant has engaged in at least two or more acts of racketeering activity. 18 U.S.C. § 1961(5); *see also United States v. Bennett,* 44 F.3d 1364, 1372 (8th Cir.1995)(establishing liability under § 1962(c) requires proof that defendant engaged in two acts of racketeering). A defendant cannot be liable under RICO unless he participated in two or more predicate offenses. *DeFalco v. Bernas,* 244 F.3d 286, 315 n. 19 (2d Cir.2001). While the statute requires at least two acts to establish a pattern, this is only a minimum requirement. A pattern is shown by facts demonstrating that "the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989)(emphasis in original). Prohibited activities are related if they "have the same or similar purposes, results, partici-

pants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901 (quotation omitted). Continuity may be demonstrated in two ways: (1) by facts showing "a series of related predicates extending over a substantial period of time" (closed-ended continuity); or (2) by facts showing that the predicate acts are part of an ongoing entity's regular way of doing business and "involve a distinct threat of long-term racketeering activity..." (open-ended continuity). *Id.* at 242, 109 S.Ct. at 2902.

■ The non-conclusory, factual allegations pertaining to the Bank show that the Bank closed the Plaintiff's checking account and failed to give information to a check-clearing company upon Plaintiff's request. The complaint does not state a claim under § 1962(c) because it is not alleged that the Bank committed two or more acts of racketeering and/or that the act or acts complained of extended over a substantial period of time. While closing a checking account at a customer's request is presumably the Bank's regular way of doing business, there is no authority for the proposition that a bank becomes a racketeer by acting like a bank. *Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank,* 934 F.2d 976, 981 (8th Cir.1991). As the pattern element has not been sufficiently pled against the Bank, the motion to dismiss should be granted.

### 4. Racketeering Activity

"Racketeering activity" is defined in the statute, *see* 18 U.S.C. § 1961(1)(listing as predicate acts certain state law crimes, conduct that is "indictable" under various federal provisions, and numerous other "offenses"). Routine bank transactions are not criminal acts or predicate offenses under the statute. Accordingly, the complaint fails to state a § 1962(c) claim against the Bank, and the claim must be dismissed.

### 5. Manifest Agreement (Conspiracy)

■ To state a claim for conspiracy to violate the RICO statute, the Plaintiff must plead facts showing the existence of an "enterprise"; that defendant was associated with or employed by the enterprise; and that the defendant "objectively manifested an agreement to participate ... in the affairs of [the] enterprise.". *United States v. Darden,* 70 F.3d 1507 (8th Cir. 1995) (citations omitted). An express agreement need not be shown, but the alleged facts must establish "a tacit understanding between the parties, and ... may be shown wholly through the circumstantial evidence of [each defendant's] action." *Handeen v. Lemaire,* 112 F.3d at 1355. It does not have to be shown that the defendant agreed to commit each of the acts necessary to achieve the conspiracy's purpose. *Atlas Pile Driving,* 886 F.2d at 996–97.

■ Aside from our holding that the complaint does not allege that the Bank was associated with or employed by a RICO enterprise, the conspiracy claim fails because the non-conclusory allegations do not show that the Bank entered into an express or tacit understanding with any other defendant to violate the statute. Accordingly, the § 1962(d) claim for conspiracy should be dismissed with respect to the Bank.

### B. Leave to Amend.

■ Plaintiff's response to the Bank's motion to dismiss is perplexing. Plaintiff asserts that the Bank's motion should be treated as a motion for summary judgment. A motion to dismiss is appropriately converted to a motion for summary judgment when "matters outside the pleading are presented to and not excluded

by the court." F.R.C.P. 12(b). However, as the Plaintiff's attorney points out, "Defendant did not attach to its supporting brief any affidavits or evidence outside the pleadings in this case." (Resp.Mot.Dism.¶ 1.) Therefore, we decline to convert the motion to dismiss into a motion for summary judgment.

It is more suitable to construe Plaintiff's response as seeking leave to amend the complaint. Plaintiff has submitted an affidavit setting forth additional details concerning her claim or claims against the Bank. If allowed to amend her complaint, the Plaintiff would include allegations that the Bank's refusal to give notice of Plaintiff's account closure directly to the local check-clearing company caused the check-clearing company to falsely report that Plaintiff's account remained open and in good standing. Plaintiff would also allege that the Bank is "relatively new to Hot Springs" and that "an employee of [the Bank] said she had heard [sic] bank officer's comment about the problems I was having . . . . If the [Bank] did not go along with what the Seligs wanted them to do, they would lose valuable business." (Pl.'s Statement Undisp. Mat. Facts, Ex. 1 ¶ 7.) Upon careful review, we find that the additional facts alleged by the Plaintiff would not cause this court to alter its opinion with regard to whether Plaintiff has a RICO claim of any sort against the Bank. Accordingly, we conclude that it would be an exercise in futility to allow the Plaintiff an opportunity to amend the complaint with regard to the Bank, and Plaintiff's motion for leave to amend will be denied.

## IV. Conclusion and Order.

Wherefor, the Court makes its order as follows:

The Bank's motion to dismiss should be and hereby is GRANTED, and all claims against Malvern National Bank are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.